SEALED

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED
AUG 20 2018
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY DEPUTY CLERK

United States of America
v.
Christopher OLSON

Defendant(s)

Case No. 1:18MJ 00144 EPG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 15, 2018, to August 16, 2018, in the county of Fresno and Kings in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 922(a)(1)(A) | Dealing/manufacturing firearms without a license |
| 18 U.S.C. Section 5861(d) | Possession of a firearm not regiserted in the National Firearms Registration and Transfer Record |

This criminal complaint is based on these facts:

See Affidavit of ATF SA Eric Penman, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

*Complainant's signature*

Eric Penman, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug. 17, 2018

*Judge's signature*

City and state: Fresno, California

Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF SPECIAL AGENT ERIC PENMAN**

I, Eric Penman, being sworn, depose and state the following:

## I. PURPOSE OF THE AFFIDAVIT

1. I make this affidavit in support of an application for a search warrant to search the residence located at **11888 Excelsior Ave. Hanford, California 93230**, described in Attachment A. I believe there is probable cause that a search of this location will uncover evidence described in Attachment B related to violations of dealing and/or manufacturing firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A), and possession of firearms not registered in the National Firearms Registration and Transfer Record, in violation of Title 26 United States Code, 5861(d).

2. I also make this affidavit in support of a criminal complaint against **Christopher OLSON** for violations of dealing and/or manufacturing firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A), and possession of firearms not registered in the National Firearms Registration and Transfer Record, in violation of Title 26 United States Code, 5861(d).

## II. RELEVANT STATUTES

3. Title 18, United States Code, Section 922(a)(1)(A) makes it unlawful for any person, except a licensed dealer, to engage in the business of dealing and/or manufacturing firearms.

4. Title 26, United States Code, Section 5861(d) makes it unlawful for any person to possess a "firearm" which is not registered to him in the National Firearms Registration and Transfer Record. The term "firearm," under 26 U.S.C. § 5845(a), includes a machinegun.

## I. AFFIANT TRAINING AND EXPERIENCE

5. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, and have been employed since November of 2015. I am currently assigned to the San Francisco Field Division/Fresno Field Office. I completed twenty-seven weeks of training, which was comprised of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program at the Federal Law Enforcement Training Center and ATF National Academy in Glynco, Georgia. I received extensive training in firearm identification, the identification and effects of controlled substances, the identification of improvised explosive

devices, surveillance and electronic surveillance, and undercover investigations. Prior to my employment with ATF, I was a Criminal Intelligence Analyst for the Central Valley High Intensity Drug Trafficking Area (HIDTA) for approximately 18 months. During this time as a Criminal Intelligence Analyst I was assigned to the U.S. Marshals Fugitive Task Force in Fresno, CA. I graduated with honors from California State University Fresno in 2013 with a BS in Criminology.

6. During the course of my employment with ATF, I have received training in and participated in several investigations including, gangs, drugs, firearms, violent crimes, and others. During these investigations, I have participated in and utilized the following investigative tools: conducting physical surveillance, interviewing suspects, writing affidavits for and executing arrest warrants, handling confidential informants, analyzing phone records obtained from pen registers, trap and trace devices, and the physical devices, and collecting and processing evidence.

7. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other ATF agents, and other law enforcement officers; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

8. Since this affidavit is being submitted for the limited purpose of securing a search warrant and criminal complaint, I have not included details of every aspect of the investigation. Facts not set forth herein, are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application. Rather, this affidavit serves to establish probable cause for a criminal complaint and for the search of the search of **11888 Excelsior Ave. Hanford, California 93230**, described in Attachment A and the seizure of items listed in Attachment B.

## II. PROBABLE CAUSE

9. Special Agents of the ATF have been investigating Christopher OLSON (OLSON) since

June of 2018. During the course of this investigation, OLSON has sold nine firearms, including three machineguns, and one silencer to an ATF Undercover Special Agent during five separate controlled purchases. OLSON does not hold a federal firearms license, as required to manufacture and deal firearms, nor has he registered the three machineguns he sold in the National Firearms Registration and Transfer Record. I therefore believe that, due to OLSON's repeated manufacturing and sales of firearms without a license, there is probable cause that OLSON has violated of Title 18 U.S.C. § 922(a)(1)(A), dealing and/or manufacturing firearms without a license. And due to OLSON's possession of five unregistered machineguns and one silencer I believe he is in violation of 26 U.S.C. § 5861, possession of firearms not registered in the National Firearms Registration and Transfer Record. In addition, as detailed below, I believe there is probable cause that OLSON resides at **11888 Excelsior Ave. Hanford, California 93230**, and that evidence of the suspected violations mentioned above will be located at or within this location.

**A. Introduction**

10. On June 15, 2018, I observed three advertisement postings on www.ARMSLIST.com[1] relating to buying and selling firearms. All three of the advertisements listed telephone number 559-998-9180 as the contact number, with two of the advertisements advising to contact "chris" at this telephone number. A query of commercially available databases showed that OLSON was the likely current user of telephone number 559-998-9180. I instructed ATF SA Mickel Sexton to begin communicating with the user of telephone number 559-998-9180 in an undercover capacity.

**B. On June 28, 2018, ATF SA Mickel Sexton, acting undercover, purchased one AR-15 type machinegun from OLSON.**

11. Between June 15, 2018 and June 28, 2018, ATF SA Mickel Sexton, acting in an undercover capacity (UC), conducted a conversation with the user of telephone number 559-998-9180 via text message at my direction. As discussed below, the user of telephone number 559-998-9180 was later determined to be OLSON. SA Sexton initiated the contact with OLSON by asking if a firearm part, advertised in one of the ARMSLIST advertisements mentioned above, was still available. As the

[1] www.ARMSLIST.com is a classified advertisements website with sections devoted to firearms, firearms parts and accessories. This website is commonly used to facilitate buying, selling, and trading firearms between individuals.

conversation continued, OLSON offered to sell SA Sexton an AR-15 type rifle for $900. During the text message conversation on June 28, 2018, SA Sexton received a text message from OLSON requesting to meet at The Armory, which is a gun store and Federal Firearms Licensee located at 2505 North Fowler Avenue, Suite 101, Fresno, California 93727. SA Sexton then asked OLSON via text message "you wanting to do paperwork on this". OLSON replied, "No I just built it I just need to get some parts lol". Based on my training and experience I understand "paperwork" in this context to be referring to the papers required to transfer a firearm legally through a Federal Firearms Licensee (FFL). Based on my training, experience, and the context of the conversation, I understand OLSON to be saying he would not be transferring the firearm to SA Sexton through an FFL. Additionally, based on my training and experience I believe OLSON was telling SA Sexton that he put the firearm together himself and needed to acquire additional firearms parts at The Armory, a store that sells gun parts. Later in the text message conversation, OLSON told SA Sexton he would be arriving at the deal in a silver Toyota Camry.

12. On June 28, 2018, SA Sexton, acting in a UC capacity, met with OLSON in the parking lot of The Armory, located at 2505 North Fowler Avenue, Suite 101, Fresno, California 93727, within the Eastern District of California, and purchased one AR-15 type machinegun bearing no serial number from OLSON for $900. OLSON arrived at this deal as the passenger in a silver Toyota Camry. OLSON introduced himself to SA Sexton as "Chris". While conducting the deal, OLSON stated "I milled out that lower myself", referring to the machinegun. Based on my training and experience, I know OLSON to be saying that he milled out an unfinished or 80% AR-15 type lower receiver, manufacturing that receiver into the milled out and finished AR-15 type lower receiver which he was now selling to SA Sexton. SA Sexton pointed to the holes drilled on the lower receiver for the auto sear[2]. Acknowledging what SA Sexton was pointing at OLSON stated, "I had the parts, um, and then I traded a guy for ah the Glock 19 with a 30 round mag and he's getting more parts, so I got it on like ah

[2] A "third pin hole" is a hole which is drilled or manufactured on a certain location on the lower receiver of an AR-15 or M-16 type rifle which allows the firearm to accept parts which make the firearm function as a machinegun. An "automatic sear" is one such part which, when installed in an AR-15 or M-16 type firearm, allows the firearm to function as a machinegun. Lower receivers which have a third pin hole are machinegun receivers and are classified as machineguns.

collateral on those". Based on my training and experience, I understand that when OLSON said "parts" he was referring to the automatic sear which when installed in the firearm allows it to function as a machinegun. My understanding of this statement made by OLSON, from my training and experience, is that OLSON possessed an automatic sear, which he traded to an individual in exchange for a Glock, Model: 19 pistol with a 30 round magazine. Additionally, I understand from my training, experience, and context of the conversation that the individual who OLSON traded the automatic sear to was in the process of obtaining additional automatic sears.

13. During the machinegun deal with OLSON on June 28, 2018, SA Sexton asked OLSON if he had the ability to manufacture additional AR-15 type firearms and machineguns. OLSON explained he had been talking to other individuals looking to have AR-15 type lower receivers drilled to accept the full auto sears. OLSON also advised SA Sexton that he could do either the polymer or aluminum AR-15 type lower receivers. OLSON told SA Sexton he was looking for cheaper AR-15 type lower receivers so he would be able to charge less in the future. OLSON also told SA Sexton that he lives in Hanford, California.

14. On June 29, 2018, I provided SA Sexton a copy of OLSON's California Department of Motor Vehicles (DMV) driver's license photograph. Sexton positively identified OLSON as the individual he purchased the machinegun from on June 28, 2018. OLSON's DMV address was listed as 11888 Excelsior Avenue, Hanford, California 93230.

**C. On July 9, 2018, ATF SA Mickel Sexton, acting undercover, purchased one firearm from OLSON.**

15. Between July 5, 2018 and July 9, 2018, SA Sexton conducted a conversation with OLSON via text message. OLSON used the phone number 559-998-9180 to communicate with SA Sexton. OLSON initiated this conversation by sending the text message "Hey I came across another ar pistol if your interested. How do you like that other one?" Based on my training and experience, when OLSON says he has an "ar pistol," I understand OLSON to be telling SA Sexton that he has another AR-15 type firearm and is offering to sell the firearm to SA Sexton. Based on the context of the conversation, I understand "that other one" to be OLSON referring to the machinegun which SA Sexton purchased on June 28, 2018. OLSON and SA Sexton went on to discuss SA Sexton purchasing one AR-

15 type pistol from OLSON. During the text message conversation, OLSON asked SA Sexton, "I'm not sure if I asked you yet but are you involved with any type of law enforcement?" SA Sexton responded with "No, used to be military tho". OLSON then responded with "I just wated to make sure lol".

16. On July 9, 2018, SA Sexton met with OLSON in the parking lot of Kohl's located at 175 E. Alluvial Ave. Fresno, California, within the Eastern District of California and purchased one New Frontier Armory, Model: LW-15, AR-15 type pistol from OLSON for $950. Prior to the deal, SA Sexton sent a text message to OLSON which read "Im here youll see me in front of kohls next to the freeway", to which OLSON responded with text message "A l8fted black f150 I'm gonna be a little late traffic is ridiculous right now". Based on my training and experience, I understand this to be OLSON explaining he would be arriving at the deal later than anticipated and would arrive in a lifted black Ford F150 pickup truck. A short time later, OLSON arrived as the passenger in a black lifted Ford F150 pickup truck bearing California license plate 8Y10286. This vehicle is registered to Steve TOSTE at 11888 Excelsior Ave. Hanford, California. The driver was later positively identified by SA Sexton to be Steve TOSTE, who suspected to be OLSON's father or step-father. TOSTE was identified by SA Sexton based on a review of TOSTE's California DMV photograph. The address listed on TOSTE's California DMV license is 11888 Excelsior Ave. Hanford, California.

17. During the deal on July 9, 2018, OLSON advised SA Sexton he had located a website and ordered a "full auto parts kit" for $150.00. Based on my training and experience, I understand "full auto parts kit" to mean components that modify an AR-15 type firearm into a machinegun. OLSON advised once the kit comes in he would let SA Sexton know and that he could get additional full auto parts kits for SA Sexton. Additionally, OLSON stated "I can do the uh, the Glock's and 1911's also", and further stated he ordered a "full auto switch for the Glock". Based on my training and experience, I understand that OLSON is saying he has the ability to manufacture and/or piece together Glock type pistols and 1911 type pistols.

**D. <u>On July 17, 2018, ATF SA Mickel Sexton, acting undercover, purchased one AR-15 type machinegun from OLSON at 11888 Excelsior Ave. Hanford, California</u>**

18. Between July 16, 2018 and July 17, 2018, SA Sexton communicated with OLSON, who

was using telephone number (559) 998-9180, and discussed the purchase of one AR-15 type machinegun and one silencer from OLSON. SA Sexton arranged the purchase of the machinegun and silencer to take place on July 17, 2018 in Hanford, California. OLSON initiated this conversation by sending text message "Hey I have something awesome that you'll want to buy lop" immediately followed by "Lol". SA Sexton replied "What do you have?". OLSON then responded with "M4 select fire" and "Yea it's all the way done and ready I'm selling it for 3500 obo". Based on my training and experience, I understand "M4 select fire" to be an AR-15 type firearm with the components which allow the firearm of functioning as a machinegun, or in semi-automatic. Based on my training and experience I understand "I'm selling it for 3500 obo" to mean that OLSON was planning to sell the machinegun for $3,500 or to whoever offered the highest amount of money. SA Sexton and OLSON went on to haggle on the price of the firearm. During the conversation, SA Sexton sent text message "Looking like I can make it to Hanford tomorrow around 1130-1230ish. Does that work" and OLSON replied with text message "Yea that's perfect my address is 11888 excelsior ave Hanford ca". On July 17, 2018, SA Sexton sent text message "Gonna leave at 10 should put me down there around 12, I'll text when I'm approx. 10 mins out". OLSON replied with text messages "Okay thanks" and "How far out are you? I stayed at my buddues house last night its only 10 mins from my house I wanna make sure I'm home when you get there". Based on my training, experience, and circumstances of the conversation, I understand OLSON to be telling SA Sexton that "11888 excelsior ave Hanford ca" is "my house", meaning, this address is OLSON's residence.

19. On July 17, 2018, SA Sexton went to **11888 Excelsior Ave. Hanford, California** in an undercover capacity and purchased one AR-15 type machinegun and a compatible magazine loaded with twenty-eight live rounds of ammunition from OLSON for $2,800. When SA Sexton arrived at **11888 Excelsior Ave. Hanford**, California he observed a lifted black Ford F150 pickup truck parked on the premises which he observed to be the same pickup truck which OLSON and TOSTE were in during the firearm purchase on July 9, 2018 detailed previously in this affidavit. During the deal, which took place in the attached garage of the residence, OLSON stated "This one was the best one I was able to put together" and "everything just milled out easy fuckin fit in easy" as he handed SA Sexton the AR-15 type lower receiver of the machinegun. Based on my training, experience, and conversations with SA

Sexton, I understand OLSON to be saying that this firearm is the best firearm he has built because it was easy to drill/mill out and the internal parts fit well inside the machinegun lower receiver. OLSON told SA Sexton, "There's a spot at the river down here if you want to go and test it". Based on my training and experience, I understand OLSON to be asking SA Sexton if SA Sexton wanted to go and test fire the machinegun. SA Sexton advised OLSON he function checked the firearm and confirmed it operated as a machinegun. SA Sexton further advised OLSON he passed a police car down the road from the residence while on the way to the residence. OLSON explained there is a Sheriff Department substation nearby the residence. When asked if he still fires guns with the Sheriff station being nearby, OLSON stated, "yeah all the fucking time, I'll do it at like two in the morning, all night all day nobody fucks with my shit". OLSON further stated, "I've shot it full auto a couple times out here".

20. During the deal, SA Sexton asked OLSON if he had a silencer for sale, as previously negotiated between SA Sexton and OLSON. OLSON explained that he did not and stated "I thought I had more of it done but then I need to redo all the internal parts and shit". OLSON explained there is a lot of trial and error making silencers and advised he has used the fuel filters as a silencer in the past, adding that they worked well. OLSON advised he would pour water or oil into the filter and it would reduce the noise for approximately five shots. SA Sexton asked OLSON if he made the firearms in the garage to which OLSON stated, "Yeah, I need to get like a fucking work bench or something".

21. During the deal, which was conducted in the attached garage of **11888 Excelsior Ave. Hanford, California**, OLSON stated "I made one of those zip guns" as he motioned to the air hockey table next the pool table in the garage. Based on my training, experience, and conversations with other ATF SAs, I know a zip gun is an improvised and/or homemade firearm. SA Sexton observed two separate pieces of pipe, one with a handle affixed to it on top of the air hockey table. OLSON advised he had fired the "zip gun" approximately ten times. Referring to the "zip gun" OLSON stated he had seen a video and obtained "The Anarchist Handbook"[3]. OLSON went on to explain, "Not the cookbook one but, so I guess they can sell it…". SA Sexton interjected by saying "You're on some fuckin watch list now dude." OLSON then stated "No it's I mean they're cool, it's three books and they tell you how

[3] The Anarchist Handbook is a three-part how to book/manual for making improvised and/or homemade weapons, including silencers, grenades, rocket launchers, booby-traps, and explosives.

to make'em fast… it's pretty cool, I like it."

**E. On July 30, 2018, ATF SA Mickel Sexton, acting undercover, purchased three firearms from OLSON, including one machinegun**

22. Between July 20, 2018 and July 30, 2018, SA Sexton communicated with OLSON, who was using telephone number (559) 998-9180, about the purchase of an AR-15 type rifle from OLSON. On July 20, 2018, OLSON initiated the conversation with a text message to SA Sexton stating, "Hey have you tested it yet lol". Based on the deal on July 17, 2018, I understand OLSON to be asking if SA Sexton had test fired the machinegun yet. A short time later in the conversation, OLSON sent text message "Okay awesome I'll have another one done sometime next week just waiting for parts" to SA Sexton. Based on the context of the conversation and my experience I understand OLSON to being saying that he will have another machinegun manufactured and completed the following week after he receives certain firearm parts. On July 23, 2018, OLSON sent SA Sexton a text messages stating, "Hey I'm finished with another, one". OLSON went on to send pictures of AR-15 type firearms to SA Sexton and the two arranged the purchase of the firearm for on July 30, 2018, at OLSON's residence located at **11888 Excelsior Avenue, Hanford, CA**.

23. On July 30, 2018, SA Sexton went to **11888 Excelsior Ave. Hanford, California** and purchased three total firearms from OLSON, one of which was a machinegun, for $1,300. When SA Sexton arrived at the residence he observed a white Chevy Blazer bearing California license plate 3XKV018 and the previously identified black Ford F150 bearing CA license plate 8Y10286 parked in the driveway of the residence. When SA Sexton entered the attached garage of the residence, he observed OLSON sitting in a wheel chair next to the pool table in the garage. OLSON told SA Sexton, "I was looking up conversion parts for my AK". Based on my training and experience, I understand an "AK" to be a type of rifle and "conversion parts" to be firearm parts which often are used to convert the firearm from one caliber to another. OLSON told SA Sexton that he had two additional AR-15 type lower receivers available for purchase. OLSON retrieved one of the lower receivers from the pool table stating, "This one's all ready for full auto". As SA Sexton inspected the firearms, he observed a lever action rifle and an AK-47 type rifle on the pool table. OLSON advised SA Sexton he obtained the AK-

47 a couple days ago. During the deal, OLSON told SA Sexton he was going to build a Glock pistol with a full auto switch. A full auto switch is a device, which when installed on a Glock type pistol, allows the pistol to function as a machinegun. Additionally, OLSON advised SA Sexton he has ammunition available for sale as well and has the equipment to load his own ammunition.

24. On July 30, 2018, SA Sexton conducted a query of the California Law Enforcement Telecommunications System (CLETS) which revealed that the white Chevy Blazer with California license plate 3XKV018 was registered to Christopher Conner OLSON at 1392 Summerdale Rd. Corvallis, Montana. On August 6, 2018, SA Penman conducted a query of 1392 Summerdale Rd. Corvallis, Montana in commercially available database, which showed this to be a likely former address for OLSON.

**F. On August 14, 2018, ATF SA Mickel Sexton, acting undercover, purchased two AR-15 type machineguns, one silencer, and one rifle from OLSON at 11888 Excelsior Ave. Hanford, California**

25. Between August 7, 2018 and August 13, 2018, SA Sexton communicated with OLSON, who was using telephone number (559) 998-9180. OLSON initiated the conversation by sending SA Sexton a text message stating, "Hey I have another one ready if you want". OLSON later sent SA Sexton a Multimedia Messaging Service (MMS) photograph of an AR-15 type machinegun followed by a text stating, "Its select fire its 3200$". OLSON also sent SA Sexton another MMS photograph of a different AR-15 type machinegun stating, "I have this one also but I'm selling it for 4300. Its select fire". Based on my training and experience, I understand "select fire" to be referring to a firearm with the components which allow the firearm of functioning as a machinegun, or in semi-automatic. During the conversation, OLSON sent SA Sexton a text stating, "Hey I got a suppressor also I'll throw in for free". Based on my training and experience, I understand "suppressor" to be a term used when referring to a silencer. SA Sexton agreed to meet OLSON at his residence located at 11888 Excelsior Ave, Hanford, CA on August 14, 2108 to purchase the two machineguns and one silencer for approximately $6500.00. OLSON also sent SA Sexton multiple text messages stating he had five additional AR-15 unfinished receivers available.

26. On August 14, 2018, SA Sexton, acting in an undercover capacity, went to **11888 Excelsior Ave. Hanford, California** and purchased two AR-15 type machineguns, one silencer, and

one French, model MAS rifle, with ammunition from OLSON for $6,900 total. This controlled purchase took place in the attached garage of **11888 Excelsior Ave. Hanford, California**. Upon SA Sexton's arrival at the residence he observed the previously identified white Chevy Blazer bearing CA license plate 3XKV018 parked in the driveway of the residence. As SA Sexton approached the open attached garage, he observed the two AR-15 type machineguns and one silencer OLSON previously provided photographs of on the pool table. SA Sexton also observed an additional rifle with magazines and two green in color cases containing ammunition on the pool table. When SA Sexton retrieved the silencer from the pool table to inspect it, OLSON advised it was heavy but quiet stating, "I can show you right now". SA Sexton later stated to me that he understood this statement to be OLSON offering to allow SA Sexton to test fire the silencer at that time. SA Sexton then inspected the one of the AR-15 type machineguns and asked OLSON about the "switches". I know from my training and experience and conversations with SA Sexton that "switches" is a reference to firearm mode of fire selection switches which allow the user of the firearm to switch between full automatic firing and semi-automatic firing. OLSON advised SA Sexton he had not tested the other AR-15 machinegun yet, further stating, "I know it works, I mean I can show you, you know the sear and how it moves". Based on my training and experience, I understand "sear" to be the machinegun sear which, when installed in a firearm, allows the firearm to function as a machinegun.

27. During the deal on August 14, 2018 at **11888 Excelsior Ave. Hanford, California**, SA Sexton retrieved a shortened 12-gauge shotgun round of ammunition from the top of an air hockey table. SA Sexton asked OLSON what he was making with them. OLSON advised he learned how to make an explosive device from the Anarchist Handbook utilizing gunpowder and light bulbs. OLSON explained to SA Sexton that by creating an opening in a lightbulb and placing the gunpowder inside, when the lightbulb is turned on, the gunpowder is ignited. OLSON advised SA Sexton one of the devises he constructed made an approximate three foot high flame when he ignited it. SA Sexton asked OLSON if SA Sexton needed to be careful walking around the area by stating, "Am I gonna blow the fuck up?". OLSON replied, "No you're good". OLSON continued stating, "If you mix chlorine and brake fluid it catches on fire".

28. During the deal on August 14, 2018 at **11888 Excelsior Ave. Hanford, California**, SA

Sexton followed OLSON to a covered workbench area in the back yard, east of the swimming pool. SA Sexton observed a drill press on the workbench and an unfinished receiver in a jig next to the drill press. These are tools/materials commonly used in the manufacturing of firearms. OLSON retrieved one of approximately three unfinished receivers from a drawer next to the workbench and handed it to SA Sexton to inspect. SA Sexton advised OLSON to let him know when the additional firearms were built and ready for purchase. OLSON asked SA Sexton, "And you want them all full?" to which SA Sexton responded, yes. OLSON then retrieved an additional unfinished receiver as he explained he messed up by drilling too far in the trigger control group housing. SA Sexton asked OLSON if he attempted to manufacture a .308 caliber rifle mentioned on a previous controlled purchase. OLSON explained that he needed to purchase the unfinished lower receiver in .308 caliber, which is approximately $200.00 compared to the unfinished lower receivers for .223/5.56 caliber which are only approximately $50.00. SA Sexton asked OLSON if the cost was due to the new law requiring unfinished receivers to have serial numbers. OLSON stated, "If you buy these lowers in California you have to have them serialized before you drill them out, but there's websites I can still get them you know from that's why I bought, I bought eight of them". As SA Sexton followed OLSON back towards the garage, OLSON picked up an outdoor lightbulb that was broken and black in color. OLSON explained the lightbulb was one of the one's he filled with gunpowder and detonated. OLSON further stated he had a big bottle of gunpowder he utilizes to reload ammunition instead of cutting open the shotgun shells.

**G. <u>OLSON does not possess a federal firearms license, and he has not registered any firearms in the National Firearms Registration and Transfer Record.</u>**

29. On August 2, 2018, ATF Industry Operations Inspector Christine Crnkovic conducted a query of Federal Firearms Licensees (FFL) and confirmed that OLSON does not have a current or past FFL license.

30. On July 19, 2018, a query of the National Firearms Registration and Transfer Record (NFRTR) was conducted for OLSON. The search yielded negative results.

31. On August 6, 2018, SA Penman received verbal confirmation from ATF Firearms Enforcement Officer Jayme Barlow that, based on physical examinations, the three machineguns

purchased from OLSON on June 28, 2018, July 17, 2018, and July 30, 2018 are all machineguns, as defined in 26 U.S.C. § 5845(b).

**H. <u>There is probable cause that OLSON resides at 11888 Excelsior Ave. Hanford, CA.</u>**

32. Based on my investigation, I believe there is probable cause that OLSON resides at **11888 Excelsior Ave. Hanford, CA**, and that evidence of his firearms and machinegun trafficking and possession will be found at his residence.

33. On June 28, 2018, OLSON told SA Sexton that he lives in Hanford, California. The address listed on OLSON's DMV license is **11888 Excelsior Avenue, Hanford, California 93230**.

34. On July 7, 2018, OLSON was arrived at the controlled firearm purchase as the passenger in a black lifted Ford F150 pickup truck bearing California license plate 8Y10286. The vehicle was driven by TOSTE, who is suspected to be OLSON's father or step-father. This vehicle is registered to TOSTE at **11888 Excelsior Avenue, Hanford, California 93230**.

35. On July 17, 2018, SA Sexton went to **11888 Excelsior Ave. Hanford, California** in an undercover capacity and purchased one AR-15 type machinegun and a compatible magazine loaded with twenty-eight live rounds of ammunition from OLSON for $2,800.

36. On July 30, 2018, SA Sexton went to **11888 Excelsior Ave. Hanford, California** and purchased three total firearms from OLSON, one of which was a machinegun, for $1,300.

37. During the text message conversation between OLSON and SA Sexton arranging the July17, 2018 controlled purchase, SA Sexton sent text message "Looking like I can make it to Hanford tomorrow around 1130-1230ish. Does that work" and OLSON replied with text message "Yea that's perfect my address is 11888 excelsior ave Hanford ca".

38. On August 7, 2018, at approximately 0545 hours, ATF SA Scott Wakelin drove by **11888 Excelsior Ave. Hanford, California** and observed a white Chevy Blazer and black lifted Ford F150 parked on the premises immediately in front of the attached garage. On this same date, between approximately 1145 hours and 1200 hours, myself and SA Wakelin conducted surveillance at **11888 Excelsior Ave. Hanford, California** and observed what appeared to be the same white Chevy Blazer and black lifted Ford F150 parked on the premises immediately in front of the attached garage. These vehicles appeared to be the same vehicles registered to OLSON and TOSTE respectively. Additionally

these vehicles were parked in the same area as during the undercover controlled purchases conducted on July 17, 2018, and July 30, 2018.

39. On August 16, 2018, between approximately 0530 hours and 0600 hours, I conducted surveillance at 11888 Excelsior Ave. Hanford, California. I observed a white Chevy Blazer parked on the premises immediately in front of the attached garage. This vehicle appeared to be the same vehicle registered to OLSON. Additionally this vehicle was parked in the same area as during the undercover controlled purchases conducted on July 17, 2018, July 30, 2018, and August 14, 2018.

## III. TRAINING AND EXPERIENCE RELATED TO FIREARMS TRAFFICKING

40. I know from my training, experience, and discussions with other experience law enforcement officials that firearm traffickers and/or manufacturers frequently possess the following evidence of their unlawful activity in their residences, places of employment, storage units, vehicles, electronic devices, and on their persons:

a) Firearms, lower receivers, upper receivers, grips, stocks, magazines, magazine repair kits, trigger assemblies, variant lower receivers, and barrels;

b) Information concerning where and from whom the trafficker/manufacturer purchased firearms or firearm parts;

c) Information concerning where and to whom the trafficker/manufacturer sold firearms or firearm parts;

d) Firearm records (purchase/sale, method of payment), notes or other documentation concerning profits made (i.e., comparing cost of purchase vs. cost of sale);

e) Customer files and lists related to the services provided or firearm sales;

f) Records and/or documents provided to customers in connection with the services provided or firearms;

g) Correspondence to and/or from actual or prospective customers or suppliers;

h) Records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business;

i) Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services;

j) Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase;

k) Photos of their firearms or firearm parts for purposes of advertising for sale, to keep track of their inventory, for insurance in case of theft, etc.;

l) Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts;

m) Written statements showing profits made from the sale of firearms or firearm parts for internal purposes;

n) Bank deposit records, checking account records, and other financial documentation showing the purchase of firearms or firearm parts, the securing of cash to purchase firearms, and the depositing of cash proceeds from the sale of firearms;

o) Other records and/or documents which appear to be related to the business including, but not limited to notes, internal correspondence, external correspondence, memoranda, directives, organizational charts;

p) Cell phone records which show the phone number and subscriber information, and numbers called/received;

q) Indicia of persons in control over a premises where the above items are found, including addressed mail, material in the premises with personal identification information, photographs of persons in or about the location, etc;

r) Tools and equipment associated with the manufacture of firearms, including CNC machines, drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws;

s) Templates, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

41. I know from my training and experience and discussions with experienced law enforcement officers, that individuals that own firearms store the firearms in safes, gun safes, locked cabinets, and/or other secured containers. I also know that individuals that possess firearms typically store their firearms in their homes. They store their firearms in their homes for a number of reasons, including, to safely and securely store the firearm, for quick access to the firearm for personal and

property protection, and for convenient access for use of firearms for sporting purposes.

42. Through my training, experience, and discussions with other law enforcement officers, I know that individuals who traffic firearms for profit normally maintain records of their financial activities in their residence, including receipts for expenditures by cash and check, bank records, and other financial documents. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business and often use accountants to complete financial statements and tax returns for their business and personal returns both in the business and their home.

43. In my experience, firearm traffickers and/or manufacturers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

44. Repeated firearm trafficking and/or manufacturing activity over lengthy periods of time generates greater amounts of evidence. Many items of evidentiary value, particularly computer and documentary evidence, are not illegal to possess and, therefore, not overtly incriminating in the criminal's view. It is also a common practice for firearm traffickers and/or manufacturers to maintain personal property used or obtained in their criminal activities and which constitute evidence of their crimes for extended periods of time.

45. As a result of my experience and training, I have learned that firearm traffickers and/or manufacturers maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators and these records may be kept on paper or contained in digital storage devices. It is also my experience that these traffickers and/or manufacturers tend to keep these accounts and records in their residence and in the areas under their control. It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

46. Based upon my training and experience, the above-described documentary evidence can be in paper form, or may be in digital form stored on computers, smart phones, digital notebooks, personal computers or any other type of digital storage device (e.g. thumb drives, external hard drives,

etc.). Although the above-described material and the devices holding the material would most likely be in their residence, it is also often found in their personal vehicles, in their personal work areas (desks, lockers, etc.) where they work, and/or rented storage lockers. In addition, since many persons these days carry their cellular telephones and, sometimes, digital notebooks, laptop computers, on their persons, it is often necessary to search and seize these items from the firearm trafficker's and/or manufacturer's person to secure this evidence.

47.    I know, based on my training and experience, that the number of firearm traffickers and/or manufacturers using computers and electronic information storage devices, like the general population as a whole, is steadily increasing, and such computer hardware, software, documentation, passwords, and electronic information storage devices may be instrumentalities, fruits, or evidence of crimes. Moreover, such computers and electronic information storage devices offer firearm traffickers and/or manufacturers and distributors convenient devices for recording information concerning firearms, including sources, co-conspirators and customers, records of purchases and sales, and any other information deemed pertinent by the firearm traffickers and/or manufacturers and distributor. Much of the electronic media storage devices, such as thumb drives, CD-ROMs, and SD memory cards, are very small, detachable, portable, and can be secreted in small containers, such as safes and clothing pockets. I also know, based on my training and experience, that firearm traffickers and/or manufacturers often communicate with their criminal associates and with potential buyers through the use of electronic mail, instant messaging, text messaging, telephone answering machines, voicemail, pagers, and telephones (cellular and land line). To the firearm traffickers and/or manufacturers, these communication devices are part of their normal business equipment.

48.    I know based on my investigation in this case that an individual with phone number (559) 998-9180, the number OLSON used to communicate with SA Sexton, has posted advertisements of firearms parts on www.ARMSLIST.com. Based on my training, experience, and conversations with other law enforcement officers, I know it is common for those engaging in the business of dealing firearms without a license to post advertisements such as these on electronic firearms marketplaces. I know it is also common for individuals posting pictures and advertisements on websites such as www.ARMSLIST.com to upload this information from their computer, electronic tablet, smart phone, or

other electronic device.

49. Accordingly, based on the investigation in this case and my training and experience, I believe that items listed in Attachment B will be found on the persons and in the vehicles and locations listed in Attachments A.

## IV. CELLULAR TELEPHONES

50. I know based on my training and experience that cellular telephones are commonly used by gun dealers to organize and communicate about firearm sales, and therefore the information to be found on cellular telephones is useful in identifying and/or verifying the user of the telephone and his/her co-conspirators. Cellular devices today can serve several functions: telephones, text messaging, cameras, personal digital assistants, calendars, address books, mini-computers allowing for electronic mail services, internet services, and rudimentary word processing.

a) The digital, cellular, and/or telephone numbers and/or the direct connect numbers assigned to the device, as well as the device's serial number, allow law enforcement to discover subscriber information as well as other devices that the target device has communicated with which, in turn, would lead to more subscriber information. The call and direct connect history information can reveal specific information about the phone numbers that the target devices have communicated as well as the time and duration of those calls. The list of contacts stored on the device potentially names co-conspirators in the crime.

b) Information on the device that does not lead to co-conspirators is still useful in identifying the user of the device (for example, if "Mom" appears in the address book of the phone, that contact will likely help identify the user of the phone).

c) Firearms traffickers at times use cell phones to take photos, videos, or audio files documenting their firearms transactions or the contraband or proceeds. Digital media, such as photos, videos, or audio files, allow law enforcement to potentially discover co-conspirators in the crime or discover types, amounts and prices of firearms trafficked as well as dates, places, and amounts of specific transactions.

d) Firearms traffickers commonly use location services on cell phones to store addresses and navigate routes used in criminal activity, such as addresses of locations where

guns may be purchased, co-conspirator addresses, and firearm storage locations. Location information on cell phones therefore allows law enforcement to discover information about firearms trafficking activity.

e) Firearms traffickers commonly use internet browsers on cell phones to access financial information, communicate with co-conspirators, and facilitate firearms deals. Records of internet activity therefore allow law enforcement to discover information about firearms activity, such as dates of communication with buyers, and co-conspirator names.

51. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellular telephones and other electronic devices offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.

52. If a user enables fingerprint security, he or she can register multiple fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of devices that offer fingerprint security often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

53. In some circumstances, a fingerprint cannot be used to unlock a device that has fingerprint security enabled, and a passcode or password must be used instead. For instance, on iPhones, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device exists only for a short time.

54. I do not know the password of OLSON's device(s), and therefore it will likely be necessary to press the finger(s) of the user(s) of the device to the device's fingerprint sensor in an

attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

55. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via fingerprint, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the Subject Premises to press their finger(s) against the fingerprint sensor of the locked device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s).

56. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the fingerprint sensor of the device for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## V. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

58. There is probable cause to believe that things that were once stored on devices may still be stored there, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e) Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

f) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration

information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

g) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

h) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

i) The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

k) I know that when an individual uses an electronic device to launder and trade virtual currency, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data

that was sent or received; and other records that indicate the nature of the offense.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Accordingly, the digital evidence, to include, but not limited to, computers, cellular telephones, digital devices, and electronic storage media, seized pursuant to this search warrant will be handled according to the protocol set out in Attachment C.

## VI. REQUEST FOR SEALING

60. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## VII. REQUEST FOR ANYTIME WARRANT SERVICE AND NO-KNOCK SERVICE

61. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the search and seizure warrant, it is requested that the court authorize the execution of this search and seizure warrant during both daytime and nighttime hours. OLSON is manufacturing and dealing firearms, including machineguns, out of the location to be searched. During two undercover controlled purchases at **11888 Excelsior Ave. Hanford, CA**, SA Sexton observed multiple firearms to which OLSON had ready access to, including an AK-47 type rifle and a homemade "zip gun". During the controlled purchase on July 17, 2018, SA Sexton observed a ghillie suit[4] in the attached garage of **11888 Excelsior Ave. Hanford, CA**. Additionally on July 17, 2018, OLSON told SA Sexton that he shoots firearms on or in the immediate vicinity of **11888 Exeelsior Ave. Hanford, CA**. When asked by SA Sexton if OLSON shoots on/nearby the residence with a Sheriff substation being close by, OLSON

[4] A ghillie suit is a type of camouflage clothing designed to make the wearer blend in to his/her surroundings. Ghillie suits are commonly utilized by military and law enforcement personnel, as well as hunters to better conceal themselves from adversaries or prey.

stated "yeah all the fucking time, I'll do it at like two in the morning, all night all day nobody fucks with my shit". OLSON further stated, "I've shot it full auto a couple times out here". Through the course of the investigation, OLSON has told SA Sexton that he has manufactured silencers.

62. OLSON has also explained to SA Sexton that he is learning from The Anarchist Handbook, which is a how-to book/manual for making improvised and/or homemade weapons, including silencers, grenades, rocket launchers, booby-traps, and explosives. SA Sexton has observed cut up shotgun ammunition in OLSON's garage. OLSON explained to SA Sexton that he learned how to make an explosive device from the Anarchist Handbook utilizing gunpowder and light bulbs. OLSON further told SA Sexton he has made these explosive devices and showed SA Sexton a broken and burned lightbulb as proof. Additionally, I know from my training and conversations with other law enforcement officers that shotgun ammunition can be used, or cut up and then used in making booby-traps or other improvised weapons/devices. I also believe that OLSON has or will acquire or manufacture additional firearm(s), which he will have quick and easy access to during the execution of the search warrant.

63. **11888 Excelsior Ave. Hanford, CA** is a semi-rural location, with open lines of sight to approach avenues. Due to the visibility of agents/officers by suspects or other possible co-conspirators while moving into position and preparing to execute this search and seizure warrant, I request an anytime warrant. An anytime warrant will allow agents/officers to safely converge on **11888 Excelsior Ave. Hanford, CA** without being prematurely observed by OLSON and/or other suspects due to ambient lighting conditions during the morning or evening twilight hours.

64. For similar reasons, to ensure the safety of the executing officer(s), it is further requested that the court authorize a no-knock warrant. Conducting knock announce protocol for a reasonable period of time will allow OLSON and/or other suspects time to access firearms on the premises of **11888 Excelsior Ave. Hanford, CA**, or access/manipulate any homemade weapons including booby-traps. Due to the numerous safety related factors outlined above, I request a no-knock warrant. A no-knock warrant will allow executing agents a wider array of tactical options to maximize the safety of the executing agents during warrant execution.

## VIII. CONCLUSION

65. Based on the facts set forth in this Affidavit, I believe there is probable cause that evidence, fruits, proceeds, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (dealing/manufacturing firearms without a license) and 26 U.S.C. § 5861(d) (possession of firearms not registered in the National Firearms Registration and Transfer Record) will be identified in Attachment A. Accordingly, I respectfully request the issuance of search warrants authorizing the search of the locations described in Attachments A as well as the seizure of the items described in Attachment B.

66. I also believe there is probable cause **Christopher OLSON** has committed violations of 18 U.S.C. § 922(a)(1)(A), dealing/manufacturing firearms without a license, and 26 U.S.C. § 5861(d), possession of firearms not registered in the National Firearms Registration and Transfer Record. I therefore request that this Court issue a warrant for OLSON's arrest.

Eric Penman
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

Swore to and subscribed before me

This 17 day of August, 2018

HON. ERICA P. GROSJEAN
UNITIED STATES MAGISTRATE JUDGE

Reviewed as to form.

/s/ Ross Pearson
ROSS PEARSON
ASSISTANT U.S. ATTORNEY